RICHARD ATKINSON et al., Appellants, *v.* THE GREAT WESTERN INSURANCE COMPANY, Respondent.

The offence of barratry may properly be insured against.

Where, in an action upon a policy of marine insurance insuring against barratry of the master of the vessel, it appears that a wrongful act was willfully done by the master with knowledge of its wrongfulness, and that it was a breach of his duty, which act was injurious to the freighters and the owners of the vessel, although the master derived no benefit therefrom, this evidence sufficiently shows a fraudulent or criminal intent upon his part to require the submission of the question whether the act was barratrous to the jury.

Defendant issued such a policy which covered a shipment of cotton from Augusta, Ga., via Charleston, to Liverpool. The master of the vessel, upon which the cotton was shipped at Charleston, gave a clear bill of lading which required the cotton to be stowed under deck. A portion of it, however, was stowed by the master on deck without plaintiffs' knowledge or assent and against the protest of the agent of the shipowners, who advised the master that he was bound to carry the cotton under deck. A violent storm arising during the voyage, the cotton on deck was thrown over to save the ship and was lost. In an action upon the policy wherein these facts appeared, *held*, that the evidence was

sufficient to authorize a finding of wrongful intent on the part of the master, and required the submission of the questions to the jury of barratry and whether the same was the proximate cause of the loss, and that a direction of a verdict for defendant was error.

The authorities upon the question as to what constitutes barratry collated and discussed.

*Atkinson* v. *Great Western Insurance Company* (4 Daly, 1) reversed.

(Argued May 10, 1875; decided June term, 1875.)

APPEAL from judgment of the General Term of the Court of Common Pleas for the city and county of New York, affirming a judgment in favor of defendant entered upon a verdict. (Reported below, 4 Daly, 1.)

This action was upon a policy of marine insurance.

In January, 1866, the defendant issued to the plaintiffs an open policy of insurance which, at the times of the transactions in this suit, was in force.

The policy had, among others, the following clauses:

" Do make insurance * * * at and from Columbus and other points and places in the interior of the State of Georgia, via Appalachicola, to port or ports in Great Britain, on cotton. To cover all shipments their own, or consigned to them or in which they have an interest. * * * To attach from time of shipment, *and also to cover the risk of fire on cotton in transit while waiting shipment*, not exceeding $50,000, in any one wharf, shed, yard, press, store, warehouse or contiguous place at one time."

" Touching the adventures and perils which the said Great Western Insurance Company is contented to bear, * * * they are of the seas, waves, * * * *barratry of the master and mariners*, and all other losses * * * occasioned by sea perils."

"All approved indorsements on the pass-book given by this company under this policy are to apply in all respects to this policy the same as if indorsed herein, and not otherwise."

Indorsed upon the policy was the following:

" 5th March, 1866. It is understood and agreed that this policy covers from the interior of the State of Georgia, via the Atlantic as well as the Gulf ports, to port or ports in Europe.

"A. M., *Second V.-Prest.*"

In October, 1866, 202 bales of cotton were shipped by plaintiffs on the South Carolina railroad at Augusta, in the interior of the State of Georgia, on its way to Liverpool by Charleston, and on or about November third 125 bales thereof, on its arrival at Charleston, were transferred to the bark Victoria for Liverpool. On the thirty-first of October the shipment was duly reported to the defendants and entered in the pass-book as follows : " By S. C. R. R. from Augusta to Charleston, thence to Liverpool, per bark Victoria."

The cotton was shipped at Augusta by Branch, Sons & Co., of that place. James N. Robson acted as their agent in Charleston, but did not know how the cotton was stowed. Before this transaction the plaintiffs had never had any cotton go through Charleston and had no agent there. They had no knowledge or notice that the cotton was stowed on deck. Street, Brothers & Co., of Charleston, were the agents of the Victoria and knew Ross, the master, and Llorca, the super-cargo. The bill of lading, signed by the master, was put in evidence and is a clean bill of lading ; it is not for goods to be stowed on deck. Thaddeus Street, of Street, Brothers & Co., testified that just before the vessel left he discovered that the captain was stowing cotton on deck ; witness opposed his carrying the cotton on deck and wanted him to send it on another vessel ; told the captain what responsibility he was assuming ; stated to the captain, substantially, that as he had signed clean bills of lading he was bound either to carry the cotton under deck or to provide for it on deck by extra insurance ; that the insurance taken on a clean bill of lading would not cover the cotton on deck. But, notwithstanding this, the master persisted in carrying it on deck. In the course of the voyage a violent storm arose and the cotton on deck was thrown overboard to save the vessel and was lost.

A letter of the supercargo, in Spanish, written by the approval of the master, shows that he knew that carrying cotton on deck was a violation of his duty. Neither the plaintiffs nor Robson, who acted for Branch, Sons & Co., who shipped the cotton at Augusta, had any knowledge or notice that the cotton was placed on the deck. Under date of November 10, 1866, the plaintiffs, after shipment of the cotton, applied to the company for the usual certificate of the insurance, which was thereupon issued. Mr. Atkinson testified, upon cross-examination, that the object of such a certificate is that it may be used as collateral security for sterling bills. When we draw sterling we have to give some evidence of the insurance.

There was an indorsement upon the certificate as follows : " Claims to be adjusted, etc., but subject to the conditions of the policy and the contract of insurance."

The counsel for the plaintiffs requested the court to submit to the jury the question whether, under the circumstances detailed by the witnesses, the conduct of the master in stowing the cargo on deck was barratry; also, that as the policy attached at Augusta, in the State of Georgia, and ran from there to Liverpool, the act of the master in stowing the cargo on deck at Charleston did not and would not deprive the plaintiffs of their right to claim damages for the loss of the cotton by a sea peril. The court refused so to charge, and to such refusal the counsel for plaintiffs duly excepted.

The court directed a verdict for defendant; to which direction plaintiffs' counsel duly excepted. Further facts appear in the opinions.

*Aug. F. Smith* for the appellants. Barratry includes every species of fraud concerning either the ship or cargo, committed by the master in respect to his trust as master, to the injury of the owners or shippers. (2 Arn. on Ins., 820, 821, note *L. ; Cook* v. *Com. Ins. Co.*, 11 J. R., 40–46; *Vallejo* v. *Wheeler*, 1 Cowp., 143–153, 154; *Lockyer* v. *Offley*, 1 T. R., 40–46; 1 Phil. on Ins., §§ 1062, 1074; *Am. Ins. Co.* v. *Bryan*, 26

Wend., 578 ; 2 M. & S., 172 ; Abb. on Shipg. [11th Lond. ed.], 159, 160 ; Park. on Ins. [2d Am. ed.], 84 ; *Lawton* v. *Sun Mut. Ins. Co.,* 2 Cush., 500, 511, 512.)   Barratry may be properly insured against.   (1 Pars. on Mar. Ins., 566–568 ; *Patapsco Ins. Co.* v. *Coulter,* 3 Pet., 222, 229–232 ; *Moss* v. *Byrom,* 6 T. R., 379, 382, 383 ; *Phyn* v. *Royal Ex. Assur. Co.,* 7 T. R., 501 ; *Brush* v. *Royal Ex. Assur. Co.,* 2 B. & Ald., 82 ; *Earle* v. *Rowcroft,* 8 East, 126 ; *Wilson* v. *Rankin,* 1 E. L. R. [K. & B.], 162 ; 3 Kent's Com., 305.)   Negligence itself, when gross, is evidence of barratry.   (*Patapsco Ins. Co.* v. *Coulter,* 3 Pet., 234 ; S. & R. on Mg. Ch., 1.)   The act of the master in putting the ninety bales on deck was barratry, or at least such an act as would have warranted the jury in finding it to be barratry under proper instructions.   (Abb. on Shipg. [5th Am. ed.], 345, note 2 ; *Sayward* v. *Stevens.,* 3 Gray 97–101 ; *The Rebecca,* Ware, 188 ; *The Waldo,* Davies, 161.)   The policy attached at Augusta and the various risks were covered as from time to time the cotton was subjected to them or was brought within their reach.   (*Boehm* v. *Combe,* 2 M. & S., 172 ; L. R., 92 ; B. Ex. Ch., 518 ; L. R., 86, 647 ; *Pelly* v. *Roy. Ex. Assur. Co.,* 1 Burr., 341.)   The neglect or failure to put the cotton under deck having been in consequence of a risk insured against, defendant is liable.   (*Am. Ins. Co.* v. *Durham,* 12 Wend., 463 ; 15 id., 9 ; *Havelock* v. *Huncill,* 3 T. R., 277 ; *Wilcocks* v. *Un. Ins. Co.,* 2 Binn., 574, 579 ; *Suckly* v. *Delafield,* 2 Cai., 222 ; 1 Pars. on Ins., 570 ; 1 Phil. on Ins., § 1075 ; Park. on Ins., 377 ; *Taylor* v. *Lowell,* 3 Mass., 343 ; *Tyril* v. *Fletcher,* 2 Cowp., 668.)   The policy having attached at Augusta, the implied warranty that the goods shall be under deck before the policy shall be deemed to have attached, can have no application.   (*Redman* v. *Wilson,* 14 M. & W., 476 ; *Copeland* v. *N. E. M. Ins. Co.,* 2 Metc.; 432, 445 ; *Dixon* v. *Sadler,* 5 M. & W., 405 ; *Holdsworth* v. *Wise,* 7 B. & C., 794 ; *Bermon* v. *Woodbridge,* 2 Doug., 788 ; *Garrigues* v. *Coxe,* 1 Binn., 592 ; *Am. Ins. Co.,* v. *Ogden,* 20 Wend., 287, 303, 304 ; *Gibson* v. *Small,* 4 H. of L. Cas., 353 ; *Michael* v. *Tredwin,* 33 E. L. & Eq., 325 ; *Thompson* v.

*Hopper*, 34 id., 266; 1 Phil. Ins., § 727; *Capen* v. *Wash. Ins. Co.*, 12 Cush., 517; *Jones* v. *Ins. Co.*, 2 Wal., Jr., 278; *Mer. Ins. Co.* v. *Morrison*, 2 Ins. L. J., 572.)

*Joseph H. Choate* for the respondents.   Defendant's policy against perils of the sea and other marine perils never attached to the cotton on deck.   (1 Arn. on Ins. [2d Am. ed.], 213; 1 Pars. Mar. Ins., 529; *Taunton Cop. Co.* v. *Mu. Ins. Co.*, 22 Pick., 108; *Lenox* v. *Un. Ins. Co.*, 3 J. Cas., 178; *Brooks* v. *Or. Ins. Co.*, 7 Pick., 259; *Wolcott* v. *Eagle Ins. Co.*, 4 id., 429; *Smith* v. *Wright*, 1 Cai. R, 44; *Smith* v. *Miss. F & M. Ins. Co.*, 11 La., 142.)   The cotton being carried on deck without notice and jettisoned to save the vessel and other interests was not lost by barratry.   (Abb. on Shipg., 183; 2 Phil. on Ins., 603; *Lockyer* v. *Offley*, 1 J. R., 259; *Vallejo* v. *Wheeler*, Cowp. 56; *Phyn* v. *Roy. Ex. Assur. Co.*, 7 T. R., 501; *Ross* v. *Hunter*, 4 id., 37; *Moss* v. *Byrom*, 6 id., 379; *Earle* v. *Rowecroft*, 8 East, 126; *Boehm* v. *Combe*, 2 M. & S., 172; *Grill* v. *Ger. I. S. Co.*, L. R., 1 C. P., 600; *Lloyd* v. *Ger. I. S. Co.*, 3 H. & C., 284; *Richardson* v. *Me. Ins. Co.*, 6 Mass., 117; *Ward* v. *Wood*, 13 id., 539; *Wiggin* v. *Amory*, 14 id., 1; *Stone* v. *Nat. Ins. Co.*, 19 Pick., 34; *Lawton* v. *Sun Mut. Ins., Co.*, 2 Cush., 500; *Wilson* v. *Ger. Mut. Ins. Co.*, 12 id., 360; *Grimm* v. *Phenix Mut. Ins. Co.*, 13 J. R., 451; *Kendrick* v. *Delafield*, 2 Cai., 67; *Am. Ins. Co.* v. *Bryan*, 26 Wend., 563; *Cook* v. *Com. Ins. Co.*, 11 J. R., 48; 2 Arn. on Ins., 819–822, 831; *Stammer* v. *Brown*, 2 Str., 1173; *Nutt* v. *Bourdiere*, 1 T. R., 323; *Todd* v. *Ritchie*, 1 Stark., 240; Abb. Shipg., 184.)

REYNOLDS, C.   It is conceded by the learned counsel for the plaintiffs that mere negligence is not barratry, and that negligence generally includes every breach of duty not clearly intentional, and to constitute barratry there must, at least, be made out an act of willful wrong or fraud done by the master against the ship and goods.   And after a careful examination of the elementary works, and the best considered cases

that have been adjudged in the courts of this country and England, I think that no act of the master of a vessel can be deemed barratry, unless it proceed from a criminal or fraudulent motive. (2 Arnold on Ins., 821, note *h ;* McCul. Dic. of Com. and Nav., tit. "Barratry;" *Cook* v. *Com. Ins. Co.,* 11 J. R., 40, 46; *Am. Ins. Co.* v. *Bryan,* 26 Wend., 578; 1 Phil. on Ins., §§ 1062, 1074; 2 Parson's Maritime Law, 236–246.) So far, we think the counsel in this case entirely agree upon the general principle of the law which must control our judgment; and the only question is, whether the court below properly disposed of it in favor of the defendant, as a question of law, or whether, as claimed by the plaintiffs, the case should have been submitted to the jury upon the whole evidence as a question of fact.

In determining this question, it will be important to refer to some adjudged cases in which certain acts and omissions of the master of a vessel, injurious to the vessel and its cargo, have been held to amount to the offence of barratry, as a matter of law, or as tending to prove it, as a matter of fact. We think there can be no rational doubt but that the crime, or *quasi* crime, of barratry may be insured against, not only by the owners of the vessel, but also by the owners of the cargo. Lord MANSFIELD, whose authority on all points connected with the law of insurance is very great, appears at one time to have thought that it would be well to exclude barratry entirely from policies, and to cease making the underwriter become the insurer of the conduct of the captain, whom he does not appoint and cannot dismiss, to the owners who can do either. "But," adds a learned writer, "though it were expedient to prevent the owners from making an insurance of this sort, nothing can be more reasonable than that third parties, who freight a ship or put goods on board, should be allowed to insure against such a copious source of loss." (McCulloch, *supra.*)

In *Lawton* v. *Sun Mutual Ins. Co.* (2 Cushing, 500, 511, 512), Chief Justice SHAW, speaking for the Supreme Court of Massachusetts, says: "But we think that they (the English

and American authorities) all agree substantially in holding that barratry consists in willful acts of the master or mariners done for some unlawful or fraudulent purpose, contrary to their duty to the owners of the vessels. The act must be willful and not accidental or caused by negligence, unless the negligence be so gross as to amount to evidence of fraud. (*Patapsco Ins. Co.* v. *Coulters*, 3 Pet. [U. S.], 222, 234.) It has been held not to be necessary that there should be fraud in the sense of an intention on the part of the master to promote his own benefit at the expense of the owners, but any unlawful act of known criminality or of gross malversation operating to the prejudice of the owner is, in legal contemplation, barratry. (*Earle* v. *Rowcroft*, 8 East, 129 ; *Heyman* v. *Parish*, 2 Campbell, 149.) Every willful act on the part of the master of known illegality, every gross malversation in his office or criminal negligence, by whatever motive induced, whereby the owner is damnified, comes within the legal definition of barratry." The case in which these observations were made, was that of the master of a whaling vessel who, instead of cruising for whales, went into the port of Tahiti, on one of the Society Islands, where the master sold a part of the ship's apparel and supplies, the crew deserted, and the vessel in consequence became so far disabled as to be unable to pursue her voyage, and was taken possession of by the United States consul at Tahiti, and sent to her owners to prevent a total loss. But the question came before the court upon a report of the whole evidence given on the trial, and the question as to what acts constituted barratry was open for consideration and judgment. We are unable to assent to a remark in the opinion of the learned chief justice of the Common Pleas, that the meaning of the word barratry, from what has been said respecting it in comparatively recent cases " has become nearly as uncertain now, as when the question was first agitated in Westminster Hall 150 years ago." We think the result of the more recent and best considered cases give a reasonably accurate view of the law. The great difficulty that seems in the first instance to have arisen, was, whether a

mere act of negligence was barratry, and it is now not only well settled but in the present case conceded, that it is not. It must be some act in a degree willful or fraudulent, a reckless disregard of duty — palpable violation of trust to the prejudice of the ship and cargo.

The earliest case in the English courts of common law relating to barratry is that of *Knight* v. *Cambridge* (reported in Strange, 581, also in Modern Rep., 230, and in 2 Ld. Raym., 1349). In that case, it was held that the neglect of the captain, in not doing his duty by paying port duties before the ship went out of port, was adjudged to be barratry, as a matter of law. (*Vallejo* v. *Wheeler*, Cowp., 143.) I do not find that the correctness of this judgment was ever questioned in any subsequent case, although the definition of barratry given in some of the reports of the case have been largely questioned.

In the case of *Moss* v. *Byrom* (6 T. R., 379), the vessel was, by the charter-party, to sail from the Bahama Islands directly to Liverpool. The master took out letters of marque, but irregular in form. He stopped an American vessel on the high seas and robbed her. He then took a prize and sent her into Bermuda, where he libeled her in his own and his owner's names. While in Bermuda, a storm arose, and the vessel was lost, with the goods belonging to the charterers on board, which were insured. The action was against the underwriters to recover the loss, and they where held liable. Lord KENYON, and the whole court, said that the act of stopping and robbing the American vessel was an act of barratry, because it was contrary to his duty to his owners. It was also held that the deviation was an act of barratry, which entitled the plaintiffs to recover. This case was obviously very much criticised at the bar, as appears from the report of *Phyn* v. *The Royal Exchange Assurance Company* (7 T. R., 501). In the latter case it appeared that the vessel was to sail from London to Jamaica, but was driven by unfriendly currents out of her course. When recovering her reckoning she was found to be between the Grand Canaries

and the Island of Teneriffe. In this location it was agreed that her course was south-west, instead of which the captain bore up for the Island of Santa Cruz, which lay north-west, and in sight, about thirty miles distant, and there came to anchor, as was supposed, to get refreshments, or in some way for his own accommodation. In this condition, an embargo was laid upon the vessel by the Spanish government, and on the news of the declaration of war between Spain and Great Britian, the vessel and cargo were afterwards condemned as a prize. The action was brought to recover of the underwriters, either by reason of a loss by capture or by barratry. Lord KENYON, before whom the cause was tried at Guildhall, in 1793, thought it could not be barratry without a fraudulent purpose in the captain at the time, and he left the question to the jury with that direction, who found that the captain's going to Santa Cruz " was a deviation, and was either owing to ignorance or something else, but that it was not fraudulent," and found a verdict for the defendant. A new trial in that case was refused, simply because the jury had found the fact that the deviation was not fraudulent, and therefore there was no barratry which, as ASHURST, J., said, had been negatived by the verdict of the jury, that there was no fraud in the case.

Mr. Justice JOHNSON, in the case of *The Patapsco Insurance Company* v. *Coulter* (3 Peters, 222, 234), said: " Certainly a master of a vessel who sees another in the act of scuttling or firing his ship, and will not rise from his berth to prevent it, is *prima facie*, chargeable with barratry. Although a mere misfeasance, it is a breach of trust, a fault, an act of infidelity to his owners. So, if, in the hight of a storm, the captain and crew turn in without resorting to the nautical precautions of laying the vessel to, and otherwise prepare her to overcome the peril, it will be left to a jury to determine if such conduct be not barratrous."

These references serve to indicate the nature of some of the acts of the master of a vessel which have been or may be adjudged barratrous, and it is apparent that to constitute

the act of barratry the act of criminalty or fraud need not necessarily be very gross in its character, but as was said by Ch. J. SHAW, in *Lawton* v. *The Sun Mutual Insurance Company* (*supra*), it is not "necessary that there should be fraud in the sense of an intention on the part of the master to promote his own benefit at the expense of the owners, but any willful act of known criminalty, or gross malversation operating to the prejudice of the owner is, in legal contemplation, barratry." It seems to follow also, that generally, unless the act of the master is of such a character, that the presumption of criminalty arises from the act itself, the question of motive and intent is for the jury, as in the case of a deviation, which is barratrous or not, as the intent of the master is found to have been evil or innocent. In our law, it is now quite well settled that most questions of mere negligence are for the consideration of a jury, and when the result depends upon the question whether any given act is fraudulent or criminal or otherwise, the fact must be determined by a jury, and to this rule there is scarcely an exception. It has been attempted to abolish all degrees of mere negligence, but the effort, in a practical sense, is as idle as would be an attempt by the courts to abolish human stupidity or depravity. Where a case depends upon mere negligence in a high or low degree, the legal rule may be applied without regard to degrees of stupidity or neglect, but no judge will fail to observe the real difference, between some very trivial fault, and the very grossest inattention. It has often been decided, that gross negligence while not *mala fides per se*, is yet evidence of it. Lord DENMAN said, in *Goodman* v. *Harvey* (4 Adol. and Ell., 870): "The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion, that gross negligence only would not be a sufficient answer where a party has given consideration for the bill; gross negligence may be evidence of *mala fides*, but it is not the same thing."

The cotton, to recover the value of which this action was

brought, was insured by the defendant, on a voyage from Columbus, Georgia, via Charleston, to Liverpool, among other things against the "barratry of the master and mariners." On or about the 3d of November, 1866, 125 of the 202 bales of cotton covered by the policy of insurance were put on board the bark Victoria, at Charleston, for Liverpool, and previous to this time the master had given a clean bill of lading for the entire shipment. It is agreed that this required that the cotton should be stowed under deck, a fact which the master was not only bound to know, but did know. He, however, stored ninety bales of the cotton on deck, and in that condition sailed for Liverpool. In a violent storm at sea, on the passage, this cotton was thrown overboard to save the vessel, and lost. I find it difficult to invent any excuse for the act of the master in stowing the ninety bales of cotton on deck under the circumstances of this case. As it turned out, it was quite as disastrous to the interest of the plaintiffs as if he had scuttled and abandoned his vessel and cargo at sea. He violated his duty and he knew it, and was also admonished of the fact. It seems a little difficult to distinguish the act from that of sailing without the payment of port duties, save, perhaps, that in the latter case the act was illegal, and in this perhaps the act was only a gross violation of duty. The question whether any given act of the master of a vessel is barratrous or not generally depends upon the intent with which the act was done. Illegal acts are often committed without any intent to do wrong, as by ignorance, mistake or inadvertence, or other cause not having any semblance of criminality. Unless, therefore, it be held that every illegal act of the master is *per se* an act of barratry, without any regard to the intent, the circumstance that the act was illegal does not appear greatly to distinguish it from any gross violation of duty or fraudulent conduct to the prejudice of the ship or cargo. I do not see that an insurance of the cotton on deck at all changes the character of the wrongful act of stowage. If of any use, it could only be for the benefit of the owners. The owners of the cotton did not choose to rely upon

the responsibility of the owners for the misconduct of the master and mariners, and therefore secured themselves by insurance on the cotton, and it was quite immaterial to them whether the owners effected an insurance for their own protection or not. No insurance of that character was effected, and the efforts in that direction do not appear to be entirely satisfactory. And if the question was at all important, it was one for the jury. And the question of the assent of any one assuming to represent the owners to the master's act of stowage was obviously of the same character. It may be true that the cotton on deck was not, by reason of the improper stowage, covered by the policy against the sea perils insured against, but it is equally true that if the wrongful stowage of the cotton on deck was an act of barratry, it was insured against under the barratry clause, or otherwise such a clause in a marine policy is without sense or meaning. The question whether the act was barratrous or not was one of fact, and I think in this case ought to have been submitted to the jury. If, as is argued on the part of the defendant, the act of the master in stowing the ninety bales of cotton on deck was to carry all the cargo and earn all the freight he could for his owners, inasmuch as he knew he was violating his duty and taking the hazard of uncommon perils, it rather tends to show his conduct was not free from suspicion of its entire innocence.

It is argued that the proximate cause of the loss was the jettison of the cotton to save the vessel, which was not barratry. There is nothing tending to show that the jettison was an act of barratry, but that is quite unimportant if, upon the evidence, a jury could properly say that the stowage on deck was willful and fraudulent, for then it was barratry and the proximate cause of the loss.

The case should have been submitted to the jury.

DWIGHT, C. The present action is brought upon a policy of insurance upon cotton, from a point in the interior of the State of Georgia to a port in Great Britain. The policy contained a clause insuring against losses occasioned by the

"barratry of the master and mariners."    Under its terms, 202 bales of cotton were shipped at·Augusta, Georgia, to Charleston, S. C., in October, 1866.    In November, on arrival at Charleston, 125 bales were transferred to the bark Victoria for Liverpool.

There was a clause in the policy to the effect that "all approved indorsements on the pass-book given by this company under this policy are to apply in all respects to this policy, the same as if indorsed herein, and not otherwise."

The entry in the pass-book was as follows: "By S. C. R. R., from Augusta to Charleston; thence to Liverpool; bark Victoria."    The bill of lading, signed by the master, was put in evidence, and is a clean bill of lading, and not for goods stowed on deck.    Ninety bales of the cotton were, however, stowed on deck by the master, and without the knowledge or assent of the plaintiffs or their agents.    The agent of the shipowner, Thaddeus Street, having discovered that the master was carrying cotton on deck opposed it, and wanted him to send it on another vessel.    He stated to him, substantially, what responsibility he was assuming; that as he had signed bills of lading he was bound to carry the cotton under deck, and that the insurance taken on a clean bill of lading would not cover the cotton on deck.    The master took the cotton on deck notwithstanding the objection of the witness.    Mr. Street (the cotton having been so shipped) urged the master to write to the agent of the shipowners at London to insure eighty bales of cotton "on deck."    The letter was written by the supercargo by advice of Mr. Street and the approval of the master. There was no evidence that any such insurance was ever taken out, nor that the supercargo had any reason to expect that it would be.    Under this state of facts and other circumstances not detailed, I think that there was a continuous insurance from Augusta to Liverpool.    Reference should also be made to the fact that there was a clause in the policy "that it was to cover the risk of fire on cotton in transit while waiting shipment."    This certainly leads to the conclusion that there was no break in the continuity of the insurance, though there

is a recognition of the fact that the risks are not the same while waiting shipment as when in transit either by land or water. If this conclusion is correct, the cotton, while in the course of shipment, was covered by the policy, unless there has been some act on the part of the assured, or for which he is responsible, relieving the insurer. It is said by the defendant that there is such an act, viz.: the misconduct of the master in lading the goods on deck. To this the plaintiffs reply, that the act of misconduct is an act of *barratry*, and against that on the part of the master they are insured. The whole controversy is thus narrowed to the inquiry whether the act of the master is barratry. The defendant, however, urges that the rights of the plaintiffs were affected by some expressions in a certificate issued to them by the defendant on the twelfth of November. In this certificate there is a statement of the insurance and of the fact that the loss, if any, is payable to the plaintiffs, with the following clause appended: "It is understood and agreed that this certificate represents and takes the place of the policy, and conveys all the rights of the original policyholder (for the purpose of collecting any loss or claim) as fully as if the property was covered by a special policy direct to the holder of this certificate, and free from any liability from paid premiums."

I do not think that this certificate has any effect upon the general rights of the plaintiffs under the policy. It was shown by Mr. Atkinson, one of the plaintiffs, that the office of the certificate was to give some evidence of the existence of the insurance when drawing sterling bills of exchange. This was necessary, as the policy itself was retained by the company in its office, and entries of the subject-matter insured were made there from time to time by the company. It must be supposed to be of the same general nature as the policy itself. Accordingly, I do not think it necessary to consider its clauses or to determine whether it is in all respects consistent with the language of the contract as embraced in the policy.

The sole question, then, to be discussed, was the act of the

master, in lading the goods upon deck, barratry? This word has not yet acquired an absolutely stable meaning, generally recognized by law writers or lexicographers. Some of the definitions found in the books will be stated: "Barratry is an act of wrong done by the master against the ship and goods." (2 Arnould on Ins., 821, note *h*.) "It is that unlawful, fraudulent or dishonest act of the master, mariners or other carriers, or of gross misconduct, or every gross and culpable negligence contrary, in every case, to their duty to their owner, and that might be prejudicial to him or to others interested in the voyage or adventure." (1 Phill. on Ins., § 1062.) "A gross and palpable violation of trust by the captain, and a reckless disregard of his duty, is barratry (though without any view to his own particular advantage) to the prejudice of his principals." (§ 1074.) Parsons says: "We hold barratry to be any wrongful act of the master, officers or crew done against the owner. * * * If an unlawful act be done without intention, or through inadvertence, or ignorance, it is not barratry. The act must be wrongful in itself and wrongfully intended." (2 Pars. on Mar. Law, 239.) Chancellor KENT says that the term means a fraudulent breach of duty on the part of the master in his character of master, or of the mariners, to the injury of the owner of the ship or cargo, and without his consent, and it includes every breach of trust committed with dishonest views." (3 Comm., 306.) He adds: Barratry is used by French writers in its larger sense as comprehending negligence as well as willful misconduct; therefore, no illustration can be safely drawn from the French authorities, when the term is used in the English and American law in a more limited sense, and applicable only to the willful misconduct of the master or mariners. From these and many other authorities which might be cited, I think it beyond dispute that an ordinary act of negligence never can be barratry. It is not necessary to consider whether there may be negligence so extreme as to raise a presumption of willful misconduct. Judge DALY, in the court below, has shown with great affluence of

learning, that mere negligence never constitutes barratry. This seems to be settled law.    I do not, however, think that this question arises in the present case.    The testimony shows conclusively that the act complained of was not an act of negligence; the master's act was deliberate and willful, and after full and sufficient warning of the effect of it.    This information came to him from the agent of the owner, in whose statements he would be expected to place confidence.    If he could be supposed to have been so unfit for his business and grossly ignorant as not to be aware of the consequences of his act, that excuse cannot be urged in his favor after the clear statements and urgent opposition of the agent.    If such an act were not deliberate and willful it is difficult to conceive what would be.    I think, accordingly, that the master's act contained all the elements required to make it proper to submit to the jury the question whether his intent was fraudulent.    The act, as has been seen, was willful and deliberate; it was done against the interest of the owner of the ship, which, by some authorities, is held to be a necessary ingredient in the case.    The owner, according to all analogies, is liable to the owner of the goods for his loss.    The master, by his unwarrantable act thus struck a heavy blow against his employer's interest.    If it were enough to constitute barratry that the interest of the freighter were wrongfully assailed, then no one will dispute that the requisite ingredient was present in an act which caused the jettison of eighty or more bales of cotton.    Having, then, plainly, the presence of a wrongful act, directed against the interest both of the owner and the freighter, the only possible doubt that can arise in the case is, whether, if a wrongful intent be necessary, that were present.    The only mode of ascertaining that point is to draw the inference of fraud, from the attendant circumstances.    The counsel for the plaintiff requested the court to submit the question, whether the act amount to barratry, to the jury.    This was refused under due exception.    It is claimed that this request was not sufficiently explicit, but that if any question was submitted it should have been that

of fraudulent intent. However, as the intent with which an act is done is a question of fact, I think it was proper to ask the judge at the trial to submit the whole subject to the jury, as a mixed question of law and fact, with appropriate instructions upon the matters of law. In *Phyn* v. *Royal Exchange Assurance Company* (7 Term R., 501), the court left it to the jury to determine whether deviation by the master was innocent or fraudulent, as an element in determining whether the act was barratrous.

It is now proper to show that these views are sustained by the authorities. There can be no doubt that if the act of lading the goods upon deck had been prohibited by statute it would have been a barratrous act on the part of the master. There can be no difference in principle, whether it is opposed to a statutory rule or to one of the common law, provided that the other necessary ingredients of the case are present, such as an act against the owner and one wrongfully intended. In *Wilson* v. *Rankin* (6 Best & Smith, 208; S. C., L. R., 1 Q. B., 166), the master stowed a portion of goods on deck and sailed without a certificate from a clearing officer that the whole cargo was below deck, contrary to 16 and 17 Victoria, chapter 107, sections 170, 171, 172. It was decided in the Exchequer Chamber that though the master had general authority from his owner to stow the cargo, no authority could be implied to load it so as to violate the statute. The court said: "If it had been shown that the master, without the express knowledge or authority of the owner, had committed the unlawful act, though for the owner's benefit, it would have been a barratrous act on his part, and if it had involved a forfeiture of the ship the underwriter would have been liable for the loss by reason of the barratry." It is to be observed that in this case stress is laid solely upon the point whether the act was *unlawful*. It was considered to be perfectly immaterial whether the owner sustained an injury or not or whether the act was intended for his benefit or not. So long as the owner did not authorize it the act was barratrous. He never can be presumed to authorize an act

which is in its nature unlawful. To take the case out of the class of barratrous acts, there must be express knowledge or authority. Much stress was laid upon the case of *Earle* v. *Rowcroft* (8 East, 126), as showing the meaning of the word "*fraudulent*," as used by the judges and text writers, who make that a part of the definition of "barratry." In that case, the master of the vessel traded with the enemy, making his ship liable to capture. It was held that the act was "fraudulent" though he intended to benefit the owner. The term "fraudulent," as thus used, seems to be substantially synonymous with breach of duty. Thus, it was said by Mr. Justice BULLER, in *Salonica* v. *Johnson*, cited in Park on Insurance, (chap. 18), that he had no doubt that if resistance to a neutral ship, to be searched by a belligerent, were a breach of neutrality (as it is now settled that it is), such resistance would be barratrous, *being contrary to the master's duty. Moss* v. *Byron*, cited with approval in *Earle* v. *Rowcroft*, is much in point. In that case, it appears that the master deviated from his course to make prizes. Lord KENYON said it was barratry, *because* it was *contrary to his duty* to the owners. "It was contrary to his duty and to the prejudice of the owners, because they stipulated by the charter-party that the ship should sail directly to Liverpool and therefore *they were liable to the freighters for any damage that might happen in consequence of that deviation.*" LAWRENCE, J., said: "If the captain did any act that increased the risk, that was barratry." This case distinctly holds that a mere willful violation of a common-law duty, injurious to the owner and without his consent, is barratrous. The principle of this case is in no respect shaken by *Phyn* v. *Royal Exchange Assurance Company* (7 Term, 501). The real controversy in that case was whether the deviation was innocent or frudulent. That question having been left to the jury, and it having been found that it was innocent, the court, in the face of such a finding, could not presume fraud or a deliberate act in violation of duty. The remarks of the court are to be interpreted from this point of view. In the case of *Boehm* v. *Combe* (2 Maule

& Sel., 172), an attempt was made to extend the word "barratry" to land carriage in a policy partly on land and partly marine. Lord ELLENBOROUGH said : "The word barratry is large enough to inclue every species of fraud or *malus dolus* commited by the wagoner or his servants."

The meaning of the term under discussion was carefully considered in *Lawton* v. *Sun Mutual Insurance Company* (2 Cush., 500). The court, per SHAW, C. J., there said : "Barratry consists in willful acts or conduct of the master or mariners done for some unlawful or fraudulent purpose, contrary to their duty to the owners of the vessel. The act must be willful and not accidental or caused by negligence, unless the negligence be so gross as to amount to evidence of fraud. It has been held not to be necessary that there should be fraud in the sense of an intention on the part of the master to promote his own benefit at the expense of the owners ; but any willful act of known criminality or of gross malversation operating to the prejudice of the owner is, in legal contemplation, barratry. Every willful act on the part of the master of known illegality, every gross malversation in his office or criminal negligence, by whatever motive induced, whereby the owner is damnified, comes within the legal definition of barratry." (Pp. 511, 512.)

The case of *Patapsco Insurance Company* v. *Coulter* (3 Peters, 231) sheds some light upon this perplexing question. JOHNSON, J., in delivering the opinion of the court, points out that much of the confusion attending, it is derived from the want of precision in the use of the term "fraudulent," and that all that is meant by that is, "an act contrary to the master's duty." In the language of BAYLEY, J., in *Busk* v. *The Royal Exchange Insurance Company* (2 Barn. & Ald., 82), the term "barratry" is an equivalent to the expression "willful misconduct." A still better form of expression is given by Lord ELLENBOROUGH, in *Earle* v. *Rowcroft* (*supra*), in treating of *breach of trust* between the master and owners as an equivalent to barratry : "Now I conceive that the trust reposed in a captain of a vessel obliges him to obey the written instructions of his owners where they give him any ; and where the instructions

are silent he is, at all events, to do nothing *but what is consonant to the laws of the land,* either with or without a view to their advantage." In commenting upon these expressions, JOHNSON, J., adds, that here it is seen that an act "inconsistent with written instructions" and an act "not consonant to the laws of their land" are brought within the description of fraud upon the owners, as applied to the definition of barratry, and that it appears from this that the meaning of the word "fraud" is not confined to moral fraud or that the term is not well chosen. (3 Peters, 231–2.) In accordance with these doctrines, willful deviation from the regular course of the voyage by the master in fraud of his owners for purposes of his own, is barratry. (*Vallejo* v. *Wheeler,* Cowper, 143.) So dropping anchor and going ashore to find a market for a private adventure is barratry, and it commences with the act of stopping the voyage. (*Ross* v. *Hunter,* 4 T. R., 33.) The same result was reached as to an intentional delay of the voyage for an unlawful purpose. (*Roscow* v. *Corson,* 8 Taunton, 684.)

For the purposes of the present case, we must accordingly hold that the willful act of the master in loading the cotton on deck, after full knowledge of the consequences of the act to his owner and the freighters, was an act known to be contrary to a settled rule of law and to his duty, and might well lead the jury to find that it was done with that species of fraudulent intent which has been considered requisite by the court in this class of cases, and that it was not only a wrongful act, but was also wrongfully intended.

If these views are sound, the goods were, while on deck, covered by the policy. The result is precisely the same as though the following words had been written in the policy : " This policy shall attach to —— bales of cotton laden on deck," etc. That being so when the jettison took place, the loss occurred by the perils of the sea, and the insurers are, of course, liable. But if this were not so, and if the barratry must be the direct cause of the loss, the same result would be reached. The case is not at all like

a loss occasioned remotely by negligence, and directly by a sea peril, where the proximate loss must be regarded. Barratry is itself a sea peril, included in a general description in a policy of marine risks or sea perils, in the absence of any stipulation to the contrary. (*Parkhurst* v. *Gloucester Mut. Fishing Ins. Co.*, 100 Mass., 301.) That peril in the present case did not spend its force until all its consequences were reached, one of which was the jettison, made necessary by the wrongful act insured against. The barratry was accordingly the direct cause of the loss.

The act of the supercargo in writing the letter, referred to in this opinion, cannot avail the defendants. It was not an act within the scope of his authority, or that of the master. It cannot be said, in any proper sense, that Mr. Street assented to the act of loading the cotton on deck, since he strenuously objected to it, and warned the master of its consequences in distinct and emphatic terms. His subsequent advice to the master, to address the letter to the assumed representative in England of the owner of the vessel, can only be properly regarded as a well-meant effort on his part to mitigate, if possible, the effect of the master's wrong. There is no evidence to the contrary, and we cannot assume, in its absence, that he intended to sanction an act wholly unwarranted by usage, and so highly detrimental both to the owner of the ship and of the cargo. The act of the master and supercargo was plainly not binding on the owner of the ship, as he cannot be supposed to have given either of them authority to do an act in violation of his own duty to the owner of the cargo. This point was considered in *Earle* v. *Rowcroft* (8 East, 140). It was there argued that as the captain united in himself the two characters of master and supercargo, and that in the character of captain he must be considered as obeying the directions of his owners, given to himself, as captain, by himself, in his character of supercargo. The court said : " It is sufficient to state such an argument to show that it can have no weight. The directions of the owners, as to the conduct of the voyage, * * * are to be looked for in their instructions, which,

coupled with their duty to their country, must, during every moment of the voyage, be considered as either expressly or impliedly directing the captain to conduct the ship to those places only where the trade might be carried on without violating the laws of the country." It is only necessary to substitute for the expression " duty to their country," the words " duty to the owner by the law of the country," to make the cases exactly parallel.

The defendants finally urge the ill consequences of a ruling that the present act may be treated as barratry, and that, by analogy, all cases of bad stowage must be regarded as barratry. This by no means follows. As has already been said, we have no disposition to hold that negligence, except in extreme cases, is barratry. (See *Grim* v. *The Phœnix Ins. Co.*, 13 J. R., 451.) It is only necessary for the purposes of this case to hold that when a wrongful act is willfully done by the master, with knowledge of its wrongfulness, and of his breach of duty, and it is injurious to the freighters and owners, it is error for a judge at the Circuit to rule, as matter of law, that it is not barratrous in its nature, and to withdraw the question of the master's intent from the jury.

The judgment of the court below should be reversed.

Judgment reversed.