STEVENS VOISIN, RESPONDENT, *v.* THE COMMERCIAL MUTUAL INSURANCE COMPANY, APPELLANT.

*Marine insurance — non-joinder of parties — a master of a vessel, not the sole owner, may commit barratry — fraud in valuation — a witness must speak from actual knowledge — expert evidence — a witness cannot give an opinion as to whether a delay at a port is excusable.*

In an action brought by one Voisin to recover for the loss of a cargo under a policy of marine insurance issued by the defendant, insuring his interest for account of whom it might concern, it appeared that the bills of lading covering such cargo belonged to a firm in which Voisin was a partner, but by the terms of the policy the remaining partner was not insured.

*Held,* that as the defect of non-joinder of parties was not set up in the answer, and did not appear upon the face of the complaint, it was waived.

That Voisin, as a partner, had an insurable interest in the cargo and was entitled to recover upon the policy as a trustee, holding the goods covered by said bills as a trustee for the firm.

That where a master enters into a conspiracy to sink his vessel at sea, subsequently abandons her at sea when leaking, in not very stormy weather, and before doing so bores augur holes in her hull to increase the flow of water, he is guilty of barratry.

That the fact that such master owned a one-sixteenth interest in the vessel did not preclude him from committing the offense of barratry.

*Semble,* that it is only a sole owner who cannot be guilty of that offense.

That while the valuation of a cargo in a policy of marine insurance is ordinarily conclusive upon the insurer, the insurance company is still entitled to show a fraudulent over-valuation and misrepresentation of the value of the subject-matter.

That where the insurer charged that a part of the cargo insured was dirt, refuse and worthless articles, and witnesses were sworn by the claimant to prove the actual shipment of valuable goods, such witnesses must speak from knowledge, and cannot, upon being shown a bill, and solely upon the faith of it, testify that all the articles named therein were put on board the ship.

That a witness cannot give an opinion that a vessel was seaworthy at a certain time when it appears that he could not have examined her hull upon the outside below the water line, and did not examine it at all upon the inside.

That where the insurer in such an action alleges as a defense thereto deviation by reason of an inexcusable delay at a port, it is not competent for a witness to give his opinion that, considering the weather prevailing during a certain period, the delay at the port in question was not extraordinary, and that said vessel got good despatch.

APPEAL by the defendant, the Commercial Mutual Insurance Company, from a judgment, entered in the office of the clerk of the city and county of New York on the 30th day of December, 1889, upon a verdict for the plaintiff for $5,056, after a trial at the New York Circuit before the court and a jury; also from an order, entered in said clerk's office on the 31st day of December, 1889, denying the motion of said defendant for a new trial.

*Treadwell Cleveland*, for the appellant.

*F. R. Coudert* and *William Mitchell*, for the respondent.

DANIELS, J.:

The verdict was recovered for the amount of insurance made by the defendant upon the cargo of the bark L. E. Cann. The cargo was laden on board of the bark at Vera Cruz and Tecolutla in Mexico. The bark left Vera Cruz about the first of February, and in five or six days thereafter arrived at Tecolutla, where she remained until the last of March, when she commenced her voyage for the city of New York, and was abandoned by the master and crew as in a sinking condition on the twenty-seventh of April following. A considerable part of the cargo was laden on board the bark at Vera Cruz for the witness Contanseau, who received bills of lading for the same, and on the 13th of February, 1882, assigned these bills for value received unto Stevens Voisin, the plaintiff. The portion of the cargo mentioned in one of the bills is stated to have been insured for the sum of $7,500, and the portion mentioned in the other bill to have been in like manner insured for the sum of $8,000,

and it was on the 10th day of March, 1882, that the plaintiff took out the policy in question from the defendant. By this policy Stevens Voisin was insured upon the cargo for the account of whom it might concern, and in case of loss the insurance was to be paid to him in funds current in the city of New York. By the policy the goods and merchandise insured, including the premiums, were valued at the sum of $29,500, and the issuing of the policy in this manner to the plaintiff was admitted by the answer to the complaint. It was objected, however, as the fact was proved that the plaintiff, at the time when the policy was taken, was a partner in business with Paul Mares, and the consignments belonged to the firm, that the action could not be maintained in his name. There was no defense set forth by the answer alleging the non-joinder of the other partner as a plaintiff in the action, and it did not appear on the face of the complaint, and the objection was, therefore, waived under section 499 of the Code of Civil Procedure.

But, as a partner in the firm which did its business under the plaintiff's name, he possessed an insurable interest in the property, for, in his capacity of a partner and in his relation to the business, he was liable to be subjected to damage by the loss of the property, and that was sufficient to vest him with an insurable interest and to entitle him to take and receive the policy in the form in which it was made. (*Riggs* v. *The Commercial Ins. Co.*, 125 N. Y., 7.) This subject was considered also in *Sturm* v. *Atlantic Mutual Insurance Company* (63 N. Y., 77), where it was held by the court that a person who has the control of property, either as owner, consignee or agent, may effect an insurance upon it in his own name, and on account of whom it may concern, making the loss payable to himself, and if a loss occurs he may maintain an action upon the policy. And the facts of the present case are sufficient to bring it within the application of that rule, for the assignments of the bills of lading were to the plaintiff, and there is evidence that it was intended by the assignments to vest the title in the firm, and by their force and effect, as they were taken by the plaintiff as a member of the firm, he held the property mentioned in the bills as a trustee for the firm. And in taking out the policy from the defendant, it was issued by the company upon no other understanding or basis than that the plaintiff himself had an insurable interest in the property, and

that in case of loss he should collect the amount for the benefit of himself, and whoever else it might concern. The application for the insurance conforms to this construction and understanding, for it is stated in it that insurance was wanted by the plaintiff for account of whom, etc., loss, if any, payable to him for $3,500, on merchandise aboard bark L. E. Cann, and to be valued at $29,500. The import, as well as the effect of, the insurance obtained in this manner was to make it individually with the plaintiff, and to assure to him the payment of any loss for whoever it might concern; and, having himself an insurable interest in the property, he was authorized, by this form of the contract, to maintain the action for the benefit of himself and his copartner for the recovery of the loss. The court, for these reasons, could not, at the trial, dismiss the complaint, as it was asked to do, on account of any infirmity in the right of the plaintiff to maintain the action. Neither could the complaint be dismissed on account of any informality in the statement of the cause of action. For it sufficiently set forth the plaintiff's case, and if it was defective in any respect, that defect was supplied by the answer. Neither could there be any well-founded objection to the right to maintain the action for the want of proof of interest or loss of the cargo, for the fact was stated in the complaint, and admitted by the answer, that such proofs had been supplied to the defendant

Evidence was given by the master that he had entered into a conspiracy with three other persons at Vera Cruz, prior to the lading of cargo on board the bark, that it should consist in part of refuse or worthless articles which were to be shipped in the form and under the description of valuable articles of cargo, and that insurance should be obtained upon the cargo, and the vessel afterwards should be sunk by the captain to defraud the insurance companies under their policies. He states himself to have become a party to this conspiracy, and that in the lading placed upon the vessel dirt and other worthless substances were made portions of the cargo, for which the bills of lading were afterwards issued and subscribed by himself; and that the cargo as it was taken on board was worth no more than forty per cent of that which was so represented to have been shipped on the bark. This evidence exhibited the master to be a desperate, unscrupulous criminal; and standing

by itself would be of little value in the determination of the rights
of parties before either a court or a jury.   But it was confirmed by
the condition of the cargo as it was removed from the bark, after
she had been found abandoned, and taken to Norfolk in the State
of Virginia.   For it appeared by the statement of cargo taken
from the bark, which was stipulated to be correct, that there was
186 cases of dirt removed from the vessel, which had been laden
upon it as a part of its cargo.   This was an unequivocal circumstance,
indicating the truth of the evidence given by the master that he
had become a party to such a conspiracy.   He stated that he had
abandoned the confederation into which he had entered after his
arrival at Tecolutla, and for that reason had removed a large part
of the sand ballast from her while lying at that port; but it is not
probable that he stated the truth in this respect, or if he did, he
changed his mind before the bark was abandoned in what was
stated to be a sinking condition.   She was then off the coast of
South Carolina on her way to the city of New York, and had
encountered some severity of weather, but no more than might
ordinarily be experienced in the course of the voyage.   It was after
the storm described by himself, and also by the first officer, had
partially subsided, that the bark was found to be in a leaking con-
dition; and the statement of the master is that the pumps were tried
and more water was ·found in the hold than they were capable of
relieving, and that the conclusion was then arrived at to abandon
the bark.   But before doing so augur holes were bored in the hull
to increase the inward flowage of the water and more surely cause the
bark to sink.   This he says he did with the understanding that it
was the English law or custom to put the vessel out of the way
when she was in a condition requiring her abandonment.   But no
such law or custom was proved otherwise than by his own statement,
and it is not probable that any law or custom of that description
had come into existence under the sanction of the English authorities.
It is much more probable that the master at this time intended
by his acts to fulfill the agreement stated to have been entered into
by him for the destruction of the vessel, for which he was to receive
the sum of $6,500, a portion of which had already been paid.   The
jury certainly were at liberty to adopt that view of the effect of the
evidence.   But after she had filled with water she did not sink below

her decks, and she was afterwards found in that condition by a steamer sent in search of her by the insurance companies having risks affected by her condition. She was then towed to Norfolk, in the State of Virginia, where, upon being taken out of the water, these augur holes were found in the hull and below the water-line; and when these facts came to the knowledge of the master it was very natural for him to resort to an excuse, improbable even as the one assigned by him was, for his conduct in requiring and procuring these holes to be bored in the hull of the vessel, expecting thereby to secure her disappearance beyond a contingency. His acts were those of a criminal, and he intended by them to put this bark, with her cargo, out of the way, to carry out his nefarious bargain and subject the insurance companies to the payment of their risks. That constituted what is known in marine insurance as the offense of barratry. It was a crime against the owners of the cargo as well as the underwriters. This subject was fully examined in *Atkinson* v. *Great Western Insurance Company* (65 N. Y., 531), and, as the offense of barratry was there described, it clearly included what was done by the master of this bark in this instance. But, as he was himself the owner of a sixteenth interest in the bark, it was objected on that ground that he could not be guilty of the crime of barratry. And the rule is undoubtedly well settled that the owner of the ship cannot commit this offense against himself or against the owners of the cargo which he may have in charge. But the cases in which that principle has been maintained were those where the master sustained, for the time being, the relation of sole owner to the vessel. (*Marcardier* v. *Chesapeake Ins. Co.*, 8 Cranch, 39; *Hallet* v. *Columbian Ins. Co.*, 8 Johns., 272; *Cook* v. *Commercial Ins. Co.*, 11 id., 40.) And the principle was generally stated, as it has been contended by the defendant's counsel, that the crime of barratry could not be committed by the master, who at the time was either the owner or part owner of the vessel. (1 Phillips on Ins. [3d. ed.], 612, § 1082.) And so the law was also considered in *Wilson* v. *General Mutual Insurance Company* (12 Cush., 362). But no other authority has been found sanctioning the position that the master, when no more than a part owner of the ship, cannot commit the offense of barratry. This subject

was considered in *Jones* v. *Nicholson* (10 Exch. 28; 26 Eng. Law and Eq., 542); and there it was concluded, without dissent, by the Court of Exchequer, that the master being also at the same time a part owner of the ship could commit the crime of barratry. And it was so held, also, upon an examination of the cases in *Phœnix Insurance Company* v. *Moog* (78 Ala., 284, 304–5, and in *Hutchins* v *Ford*, 32 Me., 363, 368–9.) And the reason, as well as good sense of the principle, are clearly with these authorities, and sustain the conclusion adopted at the trial, that the master did commit the crime of barratry, if, in pursuance of an unlawful conspiracy, he endeavored to sink the ship at the time of her abandonment. And that was a loss within the language of the policy in controversy, for among the risks which the defendant took upon itself was that of barratry of the master and mariners of the bark. The court, therefore, was right in refusing to charge the propositions presented by the defendant's counsel upon this subject, and in the charge that if the jury found that the vessel was abandoned in consequence of the barratry of the captain that it was one of the risks insured against by the policy.

The defendant's answer set forth, by way of defense, that the cargo stated to have been laden upon the bark had not, in fact, been placed on board, and evidence was given by the master to the effect that no more than about forty per cent of that which was stated had been placed on board the vessel; and the truth of this statement, coming as it did from this depraved witness, was, to a material extent, corroborated by the condition of the cargo as it was removed from the vessel at Norfolk. And while the policy contained a valuation of the property insured, which would ordinarily be binding upon the insurer, this evidence was competent, and it was received, without objection, to establish the commission of a fraud upon the insurers. And while it was stated, in *Sturm* v. *Atlantic Mutual Insurance Co.* (63 N. Y., 77), that the valuation in the policy was ordinarily conclusive upon the insurer, the rule was declared subject to the qualification that the binding effect would be destroyed in case of the existence of fraud. (Id , 81.) And so the law is also generally stated in 2 Phillips on Insurance (3d ed.), 1183, and in 1 Arnould on Insurance (2d ed.), 314, and note; and in *Ocean Insurance Company* v. *Fields* (2 Story's C. C., 59), where

it was said that " a fraudulent over-valuation and misrepresentation of the value of the subject-matter of insurance will avoid a policy of insurance." (Id., 77.) And it was apparently to invalidate this valuation that this evidence was given upon the trial. But, to meet and avoid the effect of this defense, evidence was given on behalf of the plaintiff to prove the fact to be that the merchandise, as it was claimed in his behalf, was actually placed on board the vessel and formed part of her cargo. To prove that to be the case the deposition of the witness, Malpica, was read, who was a lighterman engaged in transferring the cargo to the bark at Vera Cruz. He was asked to state particularly what merchandise, and the quantity of each kind, was shipped on the bark. But it was objected, that his answer should not be received because of other answers given by him to the effect that he had no personal knowledge of the articles, or their quantity, which were placed upon the vessel. This appeared more fully from answers to cross-interrogatories propounded to the witness, but the objection was overruled, and the counsel for the defendant excepted, and the answer of the witness was received. This ruling cannot be justified because of any informality in the statement of the objection, for the deposition was all before the court, and the answers were readily referable to, which maintained the objection; and when an objection in this manner is made it is also to be presumed, for the purposes of the ruling, that it is capable of being maintained by the facts. (*Kerr v. Hays*, 35 N. Y., 331, 337.) And there was no question made at the time when the objection was presented that it was not sustained by the answers to which reference was made. But the court without qualification overruled the objection and permitted the answer to be read, and the witness therein stated that he did not recollect the items, but seeing a bill presented which was marked " F " he could declare that the goods named in that bill were shipped on board the L. E. Cann. A motion was then made to strike out the answer for the same reasons, and that was denied by the court; and his answer to another interrogatory was permitted to be afterwards read, in which he stated, in detail, the articles which had been shipped ; but this statement, in like manner, was made from the bill marked " F," and another marked " F " 1. This bill marked " F " the witness stated was true and correct in all respects, but he did not appear

to have that knowledge, nor that the bill had been made by him or any other person in his presence. And it was on the strength of this bill, together with the other, that his answers were given that these articles were placed upon the bark as a portion of her cargo. Similar answers were obtained from the witness Hoffman, but they were objected to for the reason that it appeared by the interrogatories that this witness had no knowledge of the articles which had been placed upon the bark, but answered wholly from his observation and acquaintance with the receipts and the bills of lading, and an exception was taken to the ruling of the court permitting his evidence to be received; and as his answers which were taken wholly depended upon the receipts and bills of lading, they were, under the authority of *Palmer* v. *Great Western Insurance Company* (116 N. Y., 599), inadmissible as evidence, and so likewise were the answers obtained from the other witness Malpica, for the statements which he made were those contained in the accounts of papers referred to by him, the accuracy of which appears not to have been within his knowledge. This evidence affected a material part of the case, that which depended upon the existence of a fraud in the lading of the cargo upon the bark.

A further defense set forth by the answer was that the bark was in an unseaworthy condition at the time when she left Tecolutla, and the mate whose deposition was read as part of the plaintiff's case to disprove this defense had his attention directed to the condition of the bark while she lay at Vera Cruz. She was there from the last of November or first of December until she left in February for Tecolutla, where she remained from the first of March until the last of that month. And the evidence proved the fact to be that the waters of the Gulf of Mexico at these points were infested with worms, and that this vessel was neither coppered nor painted with copper paint, and that in that condition, during the time she lay at these ports, she was liable to be seriously injured, and her seaworthy condition reduced or destroyed by the action of these worms upon the hull. And that this evidence was reliable further appeared from the condition in which the hull was found when the bark was taken out of the water at Norfolk. And that probability was indicated also by the fact that the bark was found to be in a leaking condition, after no severe stress of weather, before her abandonment.

This witness stated that he, together with another person, made an inspection or observation of the hull at Vera Cruz when she was not less than eight nor more than twelve feet in the water. What he states to have been done by himself and the other mate was that they went in a boat around the vessel several times and examined it and found two places that looked as though they might leak where the plank came together, and another where a butt was found along side of a treenail, and he discovered no other defect in the hull of the boat, and these places he testified they calked and plugged. It is clear from his testimony, as well as the answers afterwards given by him, that no observation was or could be made by him of the hull of the vessel below the water line, and none appeared to have been made by him or the other person with him, of the inside of the bark. And in this state of his evidence he was asked: " What was the condition of the ship with respect to the staunchness of her hull, manning and general equipment." This was objected to, but the witness was permitted to answer, and an exception was taken to the ruling; and his answer was that she was in good condition. He was then asked: " What was the condition of the L. E. Cann with respect to seaworthiness at the time she left Tecolutla?" Between the time of the inspection, which was made at Vera Cruz, which was after the cargo carried by her there had been discharged and her departure from Tecolutla, no examination of the bark appears to have been made in any respect by the witness, and it was objected to his answering this question as it had been to the other, that he had not seen the vessel below the water line and had not examined her inside, and did not go over the side at Tecolutla. But the court overruled the objection, to which the defendant excepted, and the witness answered she was seaworthy. He further added in answer to an additional question, to which the same objection and exception were taken, that he considered her seaworthy in every respect or he wouldn't have gone to sea in her. This evidence had a material bearing upon the fact required to be established, that the bark was seaworthy after the policy had been issued and before she proceeded finally upon her voyage, and it may have had an important effect upon the minds of the jurors in the verdict to which they agreed. But from the observation or knowledge of the witness he was not sufficiently acquainted with the condition of the ship,

where she was liable to have been injured by the worms, to express his opinion or judgment. All that it was competent for him to do was to state what he had seen in the course of the observations made by him. (*Avery* v *N Y Central, etc.*, 121 N. Y., 31, 43.) His answers beyond that were strictly the expression of his opinion, based upon no facts, even if his opinion would otherwise have been admissible.

This evidence consequently was erroneously received, and the extent to which it may have been accepted, as proof of the seaworthy condition of the bark, can be no otherwise conjectured than by the fact that the jury must have found her to be in a seaworthy condition.

A further defense, interposed in answer to the complaint, was that of deviation by reason of an inexcusable delay at the port of Tecolutla, and to avoid that a witness, who had been engaged in trade at the ports of the Gulf of Mexico, was asked the question, taking the usual condition of weather there prevailing from the first of January until the first of April, would he consider it extraordinary, on the face of things, that a vessel was delayed by the usual course of trade as much as a month or six weeks at any one of those ports? The objection was taken to this evidence that the witness's opinion was incompetent and irrelevant. This was overruled by the court and the witness answered: " I should think that she got good dispatch, rather better than ordinary, in six weeks of time ; " and then the witness added, in answer to another question, his reasons for this conclusion. This was not a matter that was dependent upon the opinion of the witness. The facts themselves were those which could be fully described and stated by the witness and thoroughly understood and comprehended by the jury ; and it was their province, rather than that of the witness, to draw such an inference from those facts as they should be considered capable of sustaining. That duty, instead of being placed upon the jury, was ascribed to the witness, and he was permitted to give his opinion, when that opinion, in view of the facts, was not admissible as evidence.

While, therefore, the plaintiff sustained such a relation to the controversy as enabled him, under the policy issued by the defendant, to prosecute the action in his own name, if a recovery could justly be had in it, and the master was chargeable with the crime of barratry, although he was a part owner in the bark, yet on account of the answers taken from these witnesses, as to the seaworthy con-

dition of the bark, and the cargo laden upon her and her delay at the port of Tecolutla, which were erroneously permitted to be given, the judgment and the order should be reversed and a new trial directed, with costs to the defendant to abide event.

VAN BRUNT, P. J., and BARRETT, J., concurred.

Judgment and order reversed and new trial ordered, with costs to the defendant to abide event.